IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JARRON PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 3:17-CV-52-MAB |
| | ) |
| MICHAEL SANDERS, | ) |
| VENTURES JACKSON, and | ) |
| KENNETH FINNEY, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on a motion for summary judgment filed by Defendants Michael Sanders, Ventures Jackson, and Kenneth Finney (Doc. 73). For the reasons outlined below, the motion will be granted in part and mooted in part.

## BACKGROUND

Plaintiff Jarron Price is currently on parole from the Illinois Department of Corrections. He filed this *pro se* lawsuit pursuant to 42 U.S.C. § 1983 on January 18, 2017, alleging his constitutional rights were violated at Big Muddy River Correctional Center when he suffered verbal abuse from a correctional officer and was issued a false disciplinary ticket (Doc. 1; Doc. 10; Doc. 15). Following a threshold review of his complaint pursuant to 28 U.S.C. § 1915A, Plaintiff was permitted to proceed on the following claims:

**Count 1:** Defendant Kenneth Finney violated Plaintiff's due process rights

>   by writing a false disciplinary report;
>
>   **Count 2:** Defendants Michael Sanders and Ventures Jackson violated Plaintiff's due process rights by finding Plaintiff guilty of the false charge; and
>
>   **Count 3:** Defendant Kenneth Finney subjected Plaintiff to cruel and unusual punishment by verbally harassing Plaintiff while he was on suicide watch.

(Doc. 15).[1]

Defendants filed their motion for summary judgment on the merits of Plaintiff's claims on August 20, 2019 (Doc. 73). Plaintiff filed a response in opposition to the motion for summary judgment (Doc. 76). Defendants did not file a reply.

## FACTS

The following is essentially Plaintiff's version of the facts, which Defendants do not dispute for purposes of deciding their motion for summary judgment (Doc. 73, p. 2 n.1).

In June 2015, Plaintiff was serving a 15-day stint in segregation on a ticket for unauthorized movement and drug paraphernalia (Doc. 73-1, p. 5; *see also* Doc. 73-2, p. 2). Plaintiff, who suffers from extreme depression, bipolar disorder, and schizophrenia, testified that he began hearing voices while in segregation and tried to harm himself (Doc. 73-1, pp. 4, 5). He was then placed on crisis watch for a matter of days, perhaps two or three (*Id.* at p. 5). On or around June 10th, mental health staff told him he was going to be taken off crisis watch and sent back to segregation, so he asked Officer Kenneth Finney if

---

[1] Plaintiff was later permitted to file a Second Amended Complaint. (Doc. 43; Doc. 44). However, the nature of his claims remained the same. (Doc. 43; Doc. 44).

he could have his clothes back (*Id.* at p. 4). Officer Finney responded by telling Plaintiff he should just kill himself and do everybody a favor. (*Id.*). Plaintiff said he was going to write a grievance, and Officer Finney told him that if he filed a grievance, Finney would show Plaintiff "how to play the paper game." (*Id.*).

On June 11, 2015, Officer Finney issued Plaintiff an offender disciplinary report for Offense 206: Intimidation or Threats (Doc. 10-1; Doc. 73-1, p. 4). The disciplinary report states that Plaintiff repeatedly threatened to rape a juvenile offender on the same gallery as Plaintiff (Doc. 10-1). Plaintiff denies making the threat (*e.g.*, Doc. 73-1, p. 6). Plaintiff was originally set to appear before the Adjustment Committee for a hearing on the ticket on June 18, 2015, but the hearing was canceled because the institution was on lockdown due to a power outage caused by a storm (Doc. 73-1, p. 4). The hearing was rescheduled for the following day, June 19th (*Id.* at p. 4). The Adjustment Committee was comprised of Ventures Jackson and Michael Sanders, both of whom are correctional officers at Big Muddy (*see id.* at pp. 6, 7). Plaintiff claims that prior to the hearing, Defendants Jackson and Sanders already made up their mind about Plaintiff's guilt and that, at the hearing, they made a comment about "protect[ing] their own" (*Id.* at p. 4). Plaintiff later received a final summary report from the Adjustment Committee signed by the committee chairman on June 18, 2015—the day before Plaintiff's hearing (Doc. 10-1).[2] He was given

---

[2] Plaintiff was originally set to appear before the Adjustment Committee for a hearing on the ticket on June 18, 2015, but it was canceled because the institution was on lockdown due to a power outage caused by a storm (Doc. 73-1, p. 4)

three months segregation, three months on C-grade status,[3] three months dayroom restriction, three months commissary restriction, and a disciplinary transfer (Doc. 1, p. 8; Doc. 10, p. 5; Doc. 73-1, p. 8).

At some point, perhaps after Plaintiff filed a grievance on June 26th regarding the ticket and disciplinary hearing (Doc. 73-1, p. 11), a second report from the Adjustment Committee was issued with a signature date of June 19th—the date of the hearing (*see id.* at p. 8).[4] The second report also included an additional punishment: three months yard/gym restriction (*see id*; *see also* Doc. 10-1).

Plaintiff's grievance regarding the ticket was denied by the grievance office, and he then appealed to the Administrative Review Board (ARB) (Docs. 1, 10). Attached as an exhibit to Plaintiff's complaint is a letter from the ARB signed by Sarah Johnson and dated December 21, 2015, instructing that the June 11th ticket should be expunged (Doc. 10-1). The ARB's letter provided the following rationale for expunging the ticket:

> Based on a total review of all available information and a compliance check of the procedural due process safeguards outlined in DR504, this office recommends the disciplinary report be expunged due to non-compliance with DR504.80. The original hearing was not continued due to the facility

---

[3] The Illinois Administrative Code provides that:

> Offenders in "C" grade shall be ineligible to receive institutional privileges, except yard, restricted commissary and visits, excluding video visitation; however, audio-visual privileges may be restored if directed by the treating mental health professional. An offender may only purchase from the commissary personal hygiene items and other items approved by the Chief Administrative Officer, based on the offender's institutional status, once each 30 day period while in "C" grade. The 30 day period shall commence on the date of placement into "C" grade.

20 ILL. ADMIN. CODE § 504.130.

[4] Plaintiff is under the impression that after he filed his grievance, a second Adjustment Committee hearing on his ticket from Officer Finney was held on July 2nd, which he was not present for (Doc. 76, p. 4).

>being on lockdown. In addition, the second summary included additional discipline not indicated on the first served summary. The Big Muddy River Adjustment Committee is to expunge the disciplinary report.

(Doc. 10-1). On January 14, 2016—after Plaintiff had served the full punishment imposed for the June 11th ticket—the ticket was expunged by the Adjustment Committee at the direction of the ARB (Doc. 10-1).

Plaintiff served approximately one-third of his segregation sentence at Big Muddy and then he was transferred to Lawrence and served the remainder there (Doc. 73-1, pp. 8, 10). Plaintiff testified there was a difference between being in general population at Big Muddy and being in segregation (Doc. 73-1, p. 8). The difference, he said, was "[m]ainly access to the dayroom, recreation, phone privileges, able to go walk to chow to go eat. You're able to go to the yard daily. You're able to use -- access to the showers daily. That's about it." (Doc. 73-1, p. 8). He testified that when he was in general population at Big Muddy, he went to the yard "all the time," where he could lift weights, jog, or play basketball (*Id.* at p. 9). According to Plaintiff, in segregation, he did not have access to the dayroom, he had no phone privileges, his meals were brought to him in his cell, and he was only able to take a shower once or twice a week, maybe three times at most (*Id.*). He was able to go to yard up until his hearing in front of the Adjustment Committee and then "they put a restriction on [him] and [he] wasn't able to go" (*Id.*). According to Plaintiff, he was not allowed to go to yard for 90 days while in segregation (Doc 76, p. 12). In fact, he had no time outside of his cell for 90 days aside from taking a shower (*Id.* at p. 6). He had no tv in segregation (Doc. 73-1, p. 9). He read books, slept, and wrote songs and raps to occupy his time (*Id.*).

Plaintiff testified that he had a cellmate in general population and segregation at both Big Muddy and Lawrence (Doc 73-1, pp. 8–9, 10). He believed the cells in segregation at Big Muddy were slightly smaller than the cells in general population by maybe "like a foot" (*Id.* at p. 9). He said the segregation cells at Lawrence were even smaller than the ones at Big Muddy (*Id.* at p. 10). Although he did not provide exact dimensions, he said the cells were too small for him to do any sort of exercise—he is 6'5" tall and weighed approximately 315 pounds back in June 2015 (*Id.* at p. 9). When asked whether he had any space to do pushups, he testified that he did not even attempt to try because his feet would touch the wall in his cell when he laid down. (*Id.*). The only exercise he got was when he went to the yard (*Id.* at pp. 9–10), but he was not allowed to go to the yard in segregation (*Id.* at p. 10).

Plaintiff testified that during his time in segregation he tried to commit suicide and suffered unspecified "psychological damage" (Doc. 73-1, p. 11). He also developed issues with constipation from not being able to exercise, which led to hemorrhoids that necessitated surgical treatment (*Id.*).

## DISCUSSION

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir.

2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court's role is not to determine the truth of the matter, and the court may not "choose between competing inferences or balance the relative weight of conflicting evidence." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014)(citations omitted); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). Instead, "it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen*, 763 F.3d at 836.

**I.      DUE PROCESS CLAIMS** (Counts 1 and 2)

"The Due Process Clause of the Fourteenth Amendment applies only to deprivations of life, liberty, and property. Otherwise states are free to act summarily." *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) (citing *Marion v. Radtke*, 641 F.3d 874, 875 (7th Cir. 2011) (per curiam)). When an inmate raises a procedural due process claim based on disciplinary proceedings, the court undertakes a two-part analysis. *Isby*, 856 F.3d at 524. The court first evaluates whether the prisoner was deprived of a protected liberty interest and then second evaluates whether the process he was afforded was constitutionally deficient. *Id.* (citing *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 673 (7th Cir. 2016)); *accord Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019) (citing *Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)).

Here, Defendants argue only that Plaintiff was not deprived of a constitutionally protected liberty interest (Doc. 73, pp. 5–6). An inmate's liberty interest in avoiding disciplinary segregation is limited. *Hardaway v. Meyerhoff*, 734 F.3d 740, 743 (7th Cir. 2013)

(citing *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697 (7th Cir. 2009)). "[Pu]nishing an inmate by placing him in segregation will not always trigger due process protections, because '[d]iscipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law.'" *Whitford v. Boglino*, 63 F.3d 527, 533 (7th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). A protected liberty interest is triggered only when the segregation "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Lisle*, 933 F.3d at 721 (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). *See also Miller v. Dobier*, 634 F.3d 412, 414–15 (7th Cir. 2011) ("Disciplinary measures that do not substantially worsen the conditions of confinement of a lawfully confined person are not actionable under the due process clause."). In assessing whether disciplinary segregation imposes atypical and significant hardships, the court must "look to both the duration of the segregation and the conditions endured." *Lisle*, 933 F.3d at 721 (citing *Marion*, 559 F.3d at 697). *Accord Hardaway*, 734 F.3d at 743 (citation omitted). *See also Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015) ("We said in *Marion v. Columbia Correctional Institution*, 559 F.3d 693, 699 (7th Cir. 2009), that 'we must take into consideration all of the circumstances of a prisoner's confinement in order to ascertain whether' he has been deprived of liberty within the meaning of the due process clause.")

Here, Plaintiff's term in segregation was for three months. The duration, standing alone, did not pose an atypical or significant hardship. *Lekas v. Briley*, 405 F.3d 602, 612 (7th Cir. 2005) (concluding that 90 days in segregation "was not so long as to work an atypical and significant hardship"). But it may still be enough to trigger a protected

liberty interest if the conditions of confinement were unusually harsh compared to the normal prison environment. *Marion*, 559 F.3d at 697–98 ("[A] liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh.") (emphasis in original). *Accord Earl v. Racine Cty. Jail*, 718 F.3d 689, 691 (7th Cir. 2013) ("When an inmate is placed in conditions more restrictive than those in the general prison population . . . his liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time."). *See also Younger v. Hulick*, 482 Fed.Appx. 157 (7th Cir. 2012) (90 days in segregation requires inquiry into conditions).

Plaintiff was housed with a cellmate in a cell that was too small to exercise in. He was restricted from going to the yard, to the dayroom, or to the dining hall. He was essentially confined to his cell for 24 hours a day except when he was let out to shower a couple times a week. In other words, Plaintiff's focus here is on the conditions that he contends were unusually harsh for his three month stay in segregation (Doc. 10, Doc. 76).

Defendants argue that the discipline imposed on Plaintiff did not deviate substantially from the ordinary conditions of confinement because Plaintiff was routinely placed in segregation or restricted from accessing the gym/yard and day room (Doc. 73, p. 6). In other words, lack of out-of-cell movement and lack of any meaningful opportunity to exercise *were* ordinary conditions of Plaintiff's confinement. Specifically, Defendants pointed out that Plaintiff was on gym/yard restriction from February 9, 2015, to May 20, 2015, and day room restriction from March 2, 2015, to May 1, 2015, which they

claim "is nearly the same discipline" at issue here (Doc. 73, p. 6; Doc. 73-2, p. 2). However, as Plaintiff pointed out, the previously imposed periods of gym, yard, and dayroom restriction were materially different than the discipline at issue here because he was not also confined in segregation (Doc. 76; *see also* Doc. 73-2, p. 2). Furthermore, the proper way to analyze whether the conditions of segregation imposed an atypical and significant hardship is not by looking at whether the inmate had been subjected to the purportedly unconstitutional conditions on previous occasions. Rather, the critical question is whether the conditions of segregation at issue are harsher than the ordinary conditions found in a high-security prison in the state, "the sort of institution to which a prisoner may be assigned without any opportunity for a hearing." *Marion v. Radtke,* 641 F.3d 874, 876 (7th Cir. 2011). *Accord Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 699 (7th Cir. 2009).

That being said, Defendants are still entitled to summary judgment on Plaintiff's due process claim because there is simply no evidence in the record to demonstrate how the conditions of Plaintiff's time in segregation differ from those of the general population in one of Illinois' high security prisons. "[W]hether a prison has reduced a prisoner's liberty is an element of his claim, not an affirmative defense." *Marion v. Radtke*, 641 F.3d 874, 876 (7th Cir. 2011). "Once the custodian contends that the difference between one cell and another does not affect liberty, the prisoner must reply with evidence." *Id.* Here, Defendants denied that the conditions of the segregation at issue here deprived him of liberty (Doc. 34, 45). Plaintiff had to come up with evidence to demonstrate otherwise but he did not present any (*see* Doc. 76). To the extent that Plaintiff testified at his deposition

about conditions in general population at Big Muddy and Lawrence, those two institutions are only medium security facilities. *Facilities*, ILL. DEP'T OF CORR., https://www2.illinois.gov/idoc/facilities/Pages/default.aspx (last visited September 17, 2020). And the conditions Plaintiff faced here are not the type that are so unusually harsh that they obviously impose an atypical and significant hardship compared to any plausible baseline that may be used.[5] "When a plaintiff fails to produce evidence, the defendant is entitled to judgment; a defendant moving for summary judgment need not produce evidence of its own." *Marion*, 641 F.3d at 876–77 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Accordingly, Defendants Sanders, Jackson, and Finney are entitled summary judgment on Plaintiff's due process claims in Counts 1 and 2.

---

[5] *See Wilkinson v. Austin*, 545 U.S. 209, 223–24 (2005) (declining to identify the appropriate baseline for measuring what is "atypical and significant" because the prisoner's indefinite transfer to Ohio's supermax facility—where he was kept in cell for 23 hours per day with only one hour of exercise per day in a small indoor room, had almost no human contact, the lights remained on constantly, and he was disqualified from parole consideration—"imposes an atypical and significant hardship under any plausible baseline.") *But see Singh v. Gegare*, 651 Fed. Appx. 551, 555 (7th Cir. 2016) (finding no liberty interest where inmate was in segregation for 105 days with access to the showers three times a week, recreation for three hours a week, and permitted to leave cell for medical appointments, visits, and legal matters); *Hardaway v. Meyerhoff*, 734 F.3d 740, 742 (7th Cir. 2013) (holding no liberty interest where inmate spent six months and one day in segregation with a confrontational inmate, faced psychological problems, and had only weekly access to the shower and prison yard); *Lekas v. Briley,* 405 F.3d 602, 605, 610–11 (7th Cir.2005) (holding no liberty interest where inmate spent 90 days in disciplinary segregation with no access to prison educational and other programs, restricted movement outside of a cell, less access to outside yard, no ability to exercise, reduced commissary and visitation privileges, and less contact with people); *Thomas v. Ramos,* 130 F.3d 754 (7th Cir. 1997) (finding no liberty interest where inmate spent 70 days confined 24–hours per day in small cell with another inmate, no access to prison work or educational programs, no access to the prison yard, day room, or gym, and no ability to leave cell except for doctor visits and to see the segregation superintendent). *See also Pearson v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001) (a denial of a prisoner's yard privileges for not more than 90 days at a stretch is generally not cruel and unusual punishment).

## II. Eighth Amendment Claim (Count 3)

Defendant Finney argues that he is entitled to qualified immunity because it was not clearly established in June 2015 that it violated the Constitution to tell an inmate, who was on crisis watch after a failed suicide attempt, that he should just kill himself and do everybody a favor (Doc. 76, pp. 7–9).

The defense of qualified immunity generally "protects government agents from liability when their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (citing *Purvis v. Oest*, 614 F.3d 713, 720 (7th Cir. 2010)). "It protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it. *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (citing *Purvis*, 614 F.3d at 717), *cert. denied*, 206 L. Ed. 2d 856 (2020). To defeat a defense of qualified immunity, the plaintiff must show that the facts demonstrate "a violation of a constitutional right," and that the "constitutional right was clearly established at the time of the alleged violation." *Leiser*, 933 F.3d at 701 (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017)).

With respect to the first prong, Defendant Finney does not dispute that his conduct violated the Eighth Amendment (*see* Doc. 73, pp. 8–9). *See also Lisle v. Welborn*, 933 F.3d 705, 717 (7th Cir. 2019) (reversing summary judgment for defendant nurse on prisoner's Eighth Amendment deliberate indifference claim where nurse taunted and encouraged

an inmate known to be suicidal and in the midst of a mental health crisis to take his own life).

As for the second prong, "a right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Lovett v. Herbert*, 907 F.3d 986, 992 (7th Cir. 2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Plaintiff can meet his burden on this prong in one of two ways. *Lovett*, 907 F.3d at 992. First, Plaintiff can show that the Supreme Court or the Seventh Circuit has "previously held that conduct analogous to the defendant officer's actions constitutes a violation of the right at issue." *Lovett*, 907 F.3d at 992; *accord Leiser*, 933 F.3d at 702. This does not mean that Plaintiff "must be able to point to a case 'on all fours'" with the facts of his own case. *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). But he does "need to show some settled authority that would have shown a reasonable officer in [Defendant's] position that his alleged actions violated the Constitution." *Leiser*, 933 F.3d at 702 (citations omitted). Or, if there is no existing precedent that puts the unlawfulness of the conduct beyond debate, Plaintiff can show this is "one of the rare cases" when the defendant's conduct "is so egregious that it is an obvious violation of a constitutional right." *Leiser*, 933 F.3d at 702.

Either way, the inquiry into whether a right is clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Lovett*, 907 F.3d at 992 (quoting *Mullenix v. Luna*, --- U.S. ---, 136 S.Ct. 305, 308 (2015)). This requires us to consider "whether the violative nature of *particular* conduct is clearly established." *Leiser*, 933 F.3d at 702 (quoting *Mullenix*, 136 S.Ct. at 308). Courts have been

cautioned not to define the right too broadly "at a high level of generality," because "the entire second prong of qualified immunity analysis will be subsumed by the first and immunity will be available rarely, if ever." *Thompson v. Cope*, 900 F.3d 414, 421 (7th Cir. 2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) and *Golodner v. Berliner*, 770 F.3d 196, 206 (2d Cir. 2014)). But courts have also been cautioned not to define the right too narrowly "based on the exact factual scenario presented" because then the government actor "will invariably receive qualified immunity." *Thompson*, 900 F.3d at 421 (citing *Golodner*, 770 F.3d at 206)).

Here, Defendant Finney did not explicitly define the right allegedly violated (*see* Doc. 73, pp. 8–9). He did, however, imply that it was an inmate's right to be free from verbal harassment that does not create a threat of physical harm but could potentially cause severe psychological harm (*see id.*). Plaintiff took no issue with Defendant's definition (*see* Doc. 76). Even at the level of generality proposed by Defendant,[6] Plaintiff has not shown that the right was clearly established at the time of the incident in June 2015.

Plaintiff did not identify any case that clearly established the conduct at issue was unconstitutional at the time the conduct occurred (*see* Doc. 76). Perhaps it's because he cannot do so. The Seventh Circuit held in 2000 that "[s]tanding alone, simple verbal

---

[6] Defendant certainly could have tried to define the right at issue more narrowly by arguing, for example, that the proper inquiry was whether it violated the constitution to verbally harass a psychologically impaired inmate in a manner that targeted, exploited, or was indifferent to his vulnerability and caused severe psychological harm? The Court takes no position on whether a more narrow definition would have been acceptable.

harassment does not constitute cruel and unusual punishment, deprive a prisoner of a protected liberty interest or deny a prisoner equal protection of the laws." *DeWalt v. Carter*, 224 F.3d 607, 610 (7th Cir. 2000), *abrogated on other grounds by Savory v. Cannon*, 947 F.3d 409 (7th Cir. 2020). For the next fifteen years, circuit courts and district courts relied on the holding of *DeWalt* to dismiss constitutional claims based on verbal harassment that did not involve a credible threat of physical harm.[7] Things did not begin to change until the Seventh Circuit issued its opinion in *Beal v. Foster* in October 2015, undercutting the "simple verbal harassment" language in *DeWalt* and explaining that verbal harassment can rise to the level of cruel and unusual punishment when it creates a danger of physical harm or inflicts significant psychological harm. 803 F.3d 356, 358–59 (7th Cir. 2015) (Posner, J.) (reversing dismissal of an Eighth Amendment claim where inmate

---

[7] *DeWalt*, 224 F.3d at 610 (affirming dismissal of inmate's constitutional claims based on prison officials' sexually explicit and racially derogatory comments and explaining that while the comments were "unprofessional and deplorable," they did not violate the Eighth or Fourteenth Amendments). *See also Watson v. Div. of Child Support Servs.*, 560 Fed. Appx. 911, 913 (11th Cir. 2014) (citing *DeWalt*, 224 F.3d at 612) (affirming dismissal of inmate's claim based on guard's offensive and derogatory statements); *Washington v. Grace*, 445 Fed. Appx. 611, 616 (3d Cir. 2011) (citing *DeWalt*, 224 F.3d at 612) (finding inmate's allegations that he was the frequent target of racial epithets failed to state a claim); *Hung Nam Tran v. Kriz*, 377 Fed. Appx. 542, 544 (7th Cir. 2010) (citing *DeWalt*, 224 F.3d at 612) (affirming dismissal of harassment claim by civilly committed sex offender who alleged that a social worker sexually and racially harassed him by propositioning him with photographs of female genitalia, and then using racial epithets when he rejected her advances); *Allen v. Wine*, 297 Fed. Appx. 524, 526 (7th Cir. 2008) (citing *DeWalt*, 224 F.3d at 612) (dismissing inmate's Eighth Amendment claim based on officer's sexually harassing statements and gestures); *Blades v. Schuetzle*, 302 F.3d 801, 805 (8th Cir. 2002) (citing *DeWalt*, 224 F.3d at 612) (affirming dismissal of inmate's Fourteenth Amendment claim based on guard's use of racially derogatory language); *Cunningham v. Eyman*, 17 Fed. Appx. 449, 452 (7th Cir. 2001) (citing *DeWalt*, 224 F.3d at 612) (affirming dismissal of inmate's Eighth Amendment claim based on officers' derogatory remarks and racial slurs, which were "reprehensible" but did not violate the Constitution). *See also Dobbey v. Illinois Dep't of Corr.*, 574 F.3d 443, 445 (7th Cir. 2009) (stating "harassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment" and affirming dismissal of black inmate's Eighth Amendment claim that a prison guard hung a noose and then "crossed his arms looking crazy with evil eyes" because guard's actions amounted only to racial harassment, rather than a credible threat to kill, or to inflict any other physical injury)

alleged that a male officer's actions and comments in front of other inmates implied the inmate was homosexual, which he feared increased his risk of sexual assaults by other inmates caused him severe psychological harm). *See also Hughes v. Scott*. 816 F.3d 955, 956–57 (7th Cir. 2016) (Posner, J.) (reversing dismissal of claim by civilly committed sex offender because prison staff's comments that offender was "ignorant," "stupid," and a "moron" and "his life would go better if he stopped filing grievances about his treatment" went beyond simple verbal harassment due to his of his psychological vulnerability); *Lisle v. Welborn*, 933 F.3d 705, 718 (7th Cir. 2019) (explaining "the Eighth Amendment . . . protects psychologically vulnerable inmates against psychological pain deliberately inflicted by [prison officials]" and reversing summary judgment for nurse because her alleged statements "taunt[ing] and encourag[ing] an inmate known to be suicidal and in the midst of a mental health crisis to take his own life" went beyond "simple verbal harassment"). Unfortunately for Plaintiff, the decision in *Beal* did not come until approximately four months *after* Defendant Finney's comments, and therefore *Beal* could not have possibly apprised Finney of the unconstitutionality of his conduct at the time it occurred. Ultimately, this issue comes down to the timing of the statement and the focus must be on what was clearly established then - in June 2015 (not now) - and the long litany of cases cited above was the well settled precedent in June 2015.

This is also not one of the "rare cases" where Defendant Finney's conduct was "so egregious and unreasonable" that the constitutional violation was "patently obvious" to any reasonable official. *Kemp v. Liebel*, 877 F.3d 346, 354 (7th Cir. 2017) (citations omitted). Telling an already suicidal inmate to kill himself is certainly unprofessional and

unjustified, to say the least. But it was not obviously unreasonable, particularly in light of the long line of cases that found verbal harassment was not actionable. *See Leiser*, 933 F.3d at 704 (holding it was not obviously unreasonable for correctional officer to not only ignore prisoner's request to not stand behind him because it triggered his self-reported Post Traumatic Stress Disorder (PTSD) but to then increase the amount of time she stood directly behind him).

Consequently, Defendant Finney is entitled to qualified immunity and his request for summary judgment is granted.

## III.     Right to Damages

Defendants' final argument is that they are entitled to summary judgment on Plaintiff's claim for compensatory damages (Doc. 73, p. 9). Specifically, they argue that Plaintiff has not provided any evidence that he suffered a physical injury and therefore he is barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), from recovering compensatory damages for his emotional injury (*Id.*). The Court need not address this argument, however, in light of its previous conclusions that Defendants are entitled to summary judgment on the merits of Plaintiff's claims. Accordingly, this portion of Defendants' motion for summary judgment is deemed moot.

## Conclusion

The motion for summary judgment filed by Defendants Michael Sanders, Ventures Jackson, and Kenneth Finney (Doc. 73) is **GRANTED IN PART and MOOTED IN PART.** It is granted as to Defendants Sanders, Jackson, and Finney on Counts 1, 2, and 3. Those Counts are **DISMISSED with prejudice** and judgment will be entered in their

favor. The motion for summary judgment is mooted as to Defendants' argument regarding Plaintiff's right to compensatory damages.

There being no claims or Defendants remaining in this action, the Clerk of Court is **DIRECTED** to enter judgment and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: September 23, 2020**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**
